Whenever you're ready. Thank you, Your Honor. Good morning, and may it please the court. My name is Justin Weddle, and I represent Laura Akahoshi, the petitioner in this matter. And I, both on this appeal and throughout the administrative proceedings, I've represented Ms. Akahoshi, who is in the courtroom today, in the front row on my left. I'm going to start with justiciability issues, just because I think that they logically come first, although I think they're clearly satisfied in this case. Could I interrupt you? Just right at the top, I have an overarching question, because we never know what's happened since the briefing was completed. Forgive me for interrupting you, but as you dig through this, there's a brief mention that in another proceeding seeking equal access to Justice Act fees that the agency has taken the position that an inconsistent position about who's the prevailing party. Do we know what the status is of that proceeding? That proceeding has been stayed by order of the acting comptroller, and so nothing has happened since the briefs have been filed in that proceeding. Am I right it was stayed because of the pendency of this appeal? Yes, that's right, Your Honor. Yes. Go right ahead. So on justiciability issues, you know, I think the judiciability questions are answered by what is the zone of interest to be protected and whether Ms. Akihoshi has been injured. It's beyond clear that Ms. Akihoshi's interests are within the zone of interest of the due process arguments that we've made. The due process arguments relate to her right to due process. So how broad is your position? Is it that if the agency didn't go far enough to say what you want, you can appeal when you win? You're clearly saying that. But is that also work with your zone of interests in civil cases and criminal cases? Somebody gets a criminal case dismissed. They argue there's no probable cause, there's no evidence, I'm guilty. The prosecution is a sham and the district judge dismisses the case on statute of limitations grounds. Does the winning defendant have an appeal to us to say the district court should have said this whole case was frivolous and there's no basis for it? And I have all this bad stuff that comes from the indictment. And so you should grant me relief and order the district judge to say different things about why I win. No, Your Honor, I think our argument is much narrower than that. Explain to me why. Because, well, we obviously have a number of different arguments that justify vacating the decision below and all of the proceedings. But let me just pick one. She won. But go ahead. Well, Your Honor, the one reason why what we're arguing here is narrower is because, for example, with the due process arguments that we've made and the appointments clause arguments that we've made relating to the invalidity of the notice of charges itself and therefore the invalidity ab initio of the entire proceedings, the OCC never had the authority to say anything about Laura Akihoshi's conduct. And if they had agreed, if those arguments had been successful, there would have been a dismissal? No, Your Honor. There would have been a vacatur ab initio of, I mean, if the acting comptroller had said. Right about that. But that is the daylight that you're clinging to, right? Because she sought dismissal and she got dismissal, but you wanted something more. And that was to, I think, this is a question really, to have the proceeding declared invalid from the get-go, right? Well, she didn't get a dismissal. She got excoriated in a final order by the acting comptroller that ended with the word dismissal. That's a dismissal. That's a dismissal. I fully appreciate that she is claiming reputational harm. I'm not missing that point. But I do want you to answer the question. Is that the distinction? The difference? She got a dismissal, right? Yes. Okay. And there's a distinction, which Your Honor is talking about, I think, and which I think is a wide distinction. But be that as it may, there's a clear distinction between a dismissal and a vacatur, and a vacatur ab initio. And there's also a clear distinction between a dismissal and a finding in her favor on the merits, which is another one of the arguments that we've made here, which is that she was entitled to a finding on the merits exonerating her. There's a world of difference between a reluctant dismissal that criticizes her and makes legal findings against her and sends messages to the banking community in the strongest possible terms. Why isn't that true in the criminal case hypothetical I gave you where somebody is claiming they're totally innocent and they won on some technical basis and they should have won through an excoriation of the prosecution and a determination they did nothing wrong? Well, because in that hypothetical, Your Honor, there is no finding issued by the trier, you know, the judge. In that case, there's no finding by the judge that says, I find you did terrible things, but it's time barred. And the example that I would give, because I think one of our arguments is about authority, Your Honor, and the fact that the OCC really didn't have authority to take shots at Ms. Akihoshi the way that they did, is in the case that the OCC itself cites, which is Environmental Protection Information Center, Ninth Circuit Case 2001. But counsel, here, if I'm looking at page 11 of the final decision, I'm sorry, ER 12, one plausible interpretation of the record is that respondents and others adopted a strategy of deflection and delay, et cetera. It didn't say we find that respondent did it. We find that that's one plausible interpretation of the record. So it's not finding that she did all of these terrible things. It's saying that's one plausible interpretation of the record, right? Well, it said many other things as well, Your Honor. I'm sorry? The decision said a number of other things as well and said it does not at all condone her behavior. The behavior is very troubling. It's a very reluctant dismissal. All of those things amount to a censure, Your Honor. It's basically a formal reprimand in the guise of a dismissal. If we were peculiar, forgive me. No, no. Right at that point where you say it's reluctant, I appreciate all of those adjectives, meaning I don't mean appreciate in a laudatory sense. I get it. It's a very atypical ruling, right? Did we ever get an explanation why the agency chose to dismiss other than that there had been delay and what? I mean, I don't think they ever say witnesses are gone. It's very odd. I haven't seen one like this. Is there something we're missing by way of explanation for why they dismissed? I can provide my explanation, Your Honor. It's not something that's really in the record. But I think my explanation here is that the OCC is trying to block access to an Article III decision maker on the very issues that we've raised, namely the constitutionality of their structure for initiating actions. You argue that it is in the record. That's your argument in your brief. But all I'm saying is the OCC has not admitted that one of their purposes in issuing the final order in the way that they did was to accomplish what they've now argued, which is that this court is blocked from reviewing their legal findings, their directions to the banking community, and their criticisms of Ms. Sakaguchi's conduct. So part of what you're arguing is the reputational harm, right? Yes, absolutely, Your Honor. All right. So before I quote from it, I just want to make sure the plea agreement in this case is public record, right? Yes, Your Honor. All right. So the plea agreement excoriates your client. It has language in there that your client was guilty of a variety of crimes, right? I don't disagree with Your Honor. I'm not sure that it says that she was guilty of crimes. Well, it says executive, meaning you're executive with a letter of the alphabet, meaning your client made false and misleading statements to the OCC and talks about 1001, et cetera. Nothing we do in this case can ameliorate the reputational harm from that, right? And we're not asking you to, Your Honor, but I think that the reputational harm is redressable and does provide standing and provides jurisdiction to this court to review these issues. On that point, sometimes we see, after a criminal prosecution, a tort claim for something like malicious prosecution, arguing reputational harm. Has your client explored a tort claim? Because she's doing this in the context of a petition for review. Yes, we have, Your Honor. Absolutely. You have? I'm sorry? Considered that, yes. But you haven't initiated that at this point. And I think that our analysis, I'm doing this from memory, but I think the analysis was that that might be barred by the federal tort claim, not covered under the Federal Tort Claims Act and things like that. But I think that, to go back to the criminal context, for example, a criminal conviction is vacated if a defendant dies after conviction but before the appeal is heard. You know, under the OCC's argument, that could never happen because the issue would be moot, right? There'd be no punishment that could occur. The defendant is dead. And so, you know, query what the reputation, what the reputational harm would be there. But that's not a question of justiciability. I think the court has jurisdiction to consider the issues. The reason it's coming to us as a question of justiciability is because your client has to show an injury to show standing. Yes, and I think there are a number of injuries here. One of them is the injury of having been the victim of an appropriations clause violation by a federal agency. The Supreme Court in Lucia said that a person who makes a correct appointments clause challenge against executive action is entitled to relief. So that's an injury. And the Supreme Court in Lucia was citing the exact same language from its prior decision in Ryder. But in that case, there was an ongoing proceeding, right? There was an ongoing proceeding. In that case, well, in that case, there ended up being an ongoing proceeding, but the proceeding itself was closed in Lucia. But if you're right, our ruling in your favor on the appointments clause does not in any way ameliorate the harm that your client suffered by having to go through an illegal proceeding. That still would have happened. All we would be saying is, yes, she shouldn't have had to have done it, but it doesn't ameliorate the harm she suffered from having to go through it, right? It does ameliorate it, Your Honor. It doesn't cure it, for sure. But it ameliorates it because it would essentially amount to a declaration from this court that the OCC itself was violating the Constitution when it incorrectly accused my client of violating the law. And that the OCC thereafter put her through a process that had repeated orders issued against her, not just the final order, criticizing her, saying all sorts of things about her. And essentially, it would tell the world they didn't have the right to say those things because they never brought this on. It doesn't undo the proceedings she had to go through. It would be a statement from us to the world that she shouldn't have had to. Yes, and that's not unlike the case that I mentioned a moment ago, which is Environmental Protection Information Center. In that case, the district court had considered a number of issues. The parties settled. And then the district court issued an opinion, having done lots of work considering these issues, issued an opinion opining on these issues, and then had a footnote that said the parties have settled. This court not only took and decided the case, so found justiciability, but vacated the district court's decision because the district court had no business opining on those issues because the matter had been moot with the settlement. So we're asking for something analogous here, which is that the acting comptroller has no business opining on what Section 481 means and opining on the propriety of my client's conduct. Neither does the ALJ because they never brought this case in an appropriate manner under the Constitution. They also violated various due process principles. So if you put through a proceeding that's in violation of due process, there's nothing reliable that comes out of that. So the opinions and statements of the final order and the underlying proceedings, opinions and statements about my client, are invalid because they're based on due process violations. So what about the Axon case? I think a minute ago we miscommunicated, and probably because I think you were talking about Lucia, and I referred to the ongoing nature of the proceeding. So that was my error. But what about what the Supreme Court had to say about the need for the proceeding to be ongoing? Well, I think that in Axon, maybe I'm getting my cases mixed up, but I think that the Supreme Court in Axon said that the victim of an appointments clause violation, or a structural defect, unconstitutional structural defect in an administrative proceeding, doesn't have to wait and live through the proceeding. They're suffering the injury now. So you mean it doesn't have to wait, that a collateral review would be permissible, but not that it was necessary in that case, that the appeal was interlocutory? Well, I think it's not an interlocutory appeal issue in that case. But I fundamentally agree with what Your Honor just said in the form of a question. And so maybe I'll just ask it this way. I'm not sure why you think, or if you think it matters, that the proceeding we're talking about has concluded, and if so, how Axon factors into your analysis here. Well, Axon factors in because Axon in the Supreme Court said that being subjected to a structurally defective system is a legal injury, and it occurs now. Excellent. I'm sorry to interrupt your answer to the question that Judge Christen is asking. But I'm going to add to the question. Your friend said at page 32 of their brief, quoting from Axon 598 U.S. at 191, quote, a proceeding that has already happened cannot be undone. So why isn't that the point we should take from Axon? Well, because Axon was a reaction to lower court decisions that I think nearly universally said that the appellate review provisions of the Securities Act barred claimants from going to U.S. district court to challenge the structural defects of an SEC proceeding or similar proceedings. And the Supreme Court's decision opened the doors of the district court. So the Supreme Court's decision was not trying to close doors. They were trying to open doors, and they were saying you don't have to wait until the end. But I don't think that they were making the reverse argument, which is what the OCC is saying, and from the language that Your Honor just quoted. I don't think that the Supreme Court was saying that there is no injury having there is no redressability or injury having suffered the entire proceeding. I think that they were saying that you can't fully remedy it after you've gone through it. But that's not the same as saying there is no amelioration to take Your Honor's word that you posed in the form of a question to me. There is a method of ameliorating the harm. She doesn't get back the time that she spent in depositions and so on and so forth. But I believe, and I think that this is consistent with lots of decisions that courts make, including the one that I just talked about, where they vacated a decision for lack of jurisdiction, but also declaratory judgment actions, all sorts of reputational harm actions, appeals from a formal censure order, right? A censure order is essentially a criticism and vacatur of unfair proceedings. All of those things provide some measure of relief. And the measure of relief is a statement from a higher court, namely this court, saying that the proceedings were invalid from the beginning. And so all of that stuff, yes, those words are still out there. We can't take them back. But it's a declaration from this court saying that those words were essentially wrongfully issued. And that would mean a great deal to my client. May I ask a question of you? You say she suffered an injury because her equal access to Justice Act fee application has been stayed. Why has it been stayed? Well, it's been stayed on order of the acting comptroller after briefing and essentially when we were about to get to the position of reviewing. It's been stayed by improper agency action. Why don't you petition for hearing on that in this court? Well, we can. We could do that. It's we could we could try to do that. I think that actually that petition would be. I think that petition would go to the district court because I think that would be a straight Administrative Procedure Act petition. But the the the harm that we've talked about with respect to the Equal Access to Justice Act proceeding is not the harm of it being stayed. The harm is that the OCC represented by counsel in this case stands up and says, Miss Sakahoshi won. She prevailed. She should stop complaining. And then the OCC represented by counsel in the E.A.J.A. Act says she lost. She did not prevail. She cannot prevail on an E.A.J.A. action because not only was the dismissal not prevailing, but also look at what the acting comptroller said about the conduct. Obviously, the conduct was reprehensible, although the acting comptroller didn't find it to be proven, but it was reprehensible. So necessarily the OCC's actions are are with substantial basis and the OCC is not liable under the E.A.J. Act. So the OCC is talking out of both sides of its mouth with respect to these issues. And here they say everything that the comptroller said other than the word dismissed is irrelevant. And there they say essentially we're barred from any E.A.J.A. recovery because we lost. The agency, right? The agency saying that. Yes. And once. Why don't you petition the Ninth Circuit to reverse the agency action? That's the way it's done under E.A.J.A. Well, we will do that when the agency issues a final order. We don't need a final order. If the agency is wrong on the law, you can petition the Ninth Circuit to reverse the agency. It's a discretionary grant of petition, but it can be done. I won't say anymore. Thank you. Thank you, Your Honor. I see my time is up. I've reserved some time for rebuttal. Thank you, Your Honors. You actually have in your overtime. When you come back, we'll put another minute on the clock. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Jason Fernandez on behalf of the OCC. I'm sorry. Jason Fernandez on behalf of the OCC. The comptroller's final decision provided Ms. Akihoshi with the full measure of relief she requested. Well, it went out of its way. I can well understand why she's got a complaint here about injury by way of reputational harm. I don't know if I've ever seen an order quite like this. I understand that concern, Your Honor. Is it correct that in the other action, the government has taken the position that she prevailed, and in this action, taking the position that she has no injury? So the comptroller has not taken that position? Enforcement counsel made that argument?  The government has taken that position. That's true, Your Honor, but that is simply a feature. But who's the prevailing party? If we decide here that she didn't suffer an injury for purposes of standing, who will the prevailing party be? So I want to note that there's a slight difference between the question of prevailing party status under EJ and prevailing party with respect to jurisdiction, but they are similar. But I do want to say that because that's a live issue in her EJ case, I'm not authorized to make a binding representation on behalf of the comptroller. I also want to note that the ALJ did not even— You're not going to answer my question? Well, I want to answer the thrust of it, but because it's a live issue in her EJ case— I'm always very concerned when the government takes inconsistent positions. So, Your Honor, I think that the separation of functions between enforcement counsel and the comptroller, that separation would have no teeth if the comptroller always agreed with the positions taken by enforcement counsel. I appreciate there hasn't been a ruling. I'm asking about what position was advanced. And I think you've told me that—or opposing counsels told me that the action stayed. But what I was asking is what position did counsel take? And it sounds like the counsel's taken an inconsistent position. Enforcement counsel has taken that position, yes. But to the extent that that is an argument that is, like, not very successful, then the comptroller will rule against that argument. So, counsel, let me ask a related question. Looks to me here that Ms. Akihoshi prevailed. Am I wrong? Yes, she prevailed. The answer is no, you're not wrong. Thank you, Your Honor. She prevailed. That's okay. And I'd just like to make a few points. So because Ms. Akihoshi received a fully favorable judgment, she cannot appeal for three distinct insurmountable jurisdictional reasons. First, the longstanding rule of appellate practice. Second, Article III of the Constitution. And third, the statutes that provide for this Court's jurisdiction. And I'd like to start with the longstanding rule of appellate practice. This Court articulated the rule in Good Samaritan, and it controls the case here. Parties may not appeal from favorable judgments to seek review of issues that are not And that's exactly what happened here. In her briefing before the comptroller, she requested dismissal of the action, summary disposition in her favor, or at a minimum, remand for a hearing. That's why she's the prevailing party. She won. Thank you, Your Honor. Again, that is a position that Enforcement Counsel has taken in the proceeding below. And to Judge Bea's point, if the comptroller were to accept that position and rule against her under each application, then the proper forum for relief with respect to that argument and that injury is by petitioning for review of any resulting EJIA order. It's extraordinary that after all these years, the agency sort of folds up its tent and goes home. There isn't a reason given here. But what could happen, it seems to me, going back to Judge Bennett's position, is this does happen to criminal defendants who ultimately prevail but feel pretty beaten up. And reputationally, they are pretty beaten up. But this could result in a position where she would professionally be in a position to say That's fair, and I think that's exactly why Congress created the Equal Access to Justice Act, so that litigants who prevail against the United States, if they show that the agency was not substantially justified in bringing the action, they are not only entitled to fees, a monetary award, but they're also entitled to a statement declaring that the agency was not substantially justified in bringing the action. And so that is the problem. And so your position there is clearly going to be that the agency was substantially justified. And I appreciate that. We see that sometimes, even though they're wrong. This is a hypothetical. Sometimes the government is wrong but substantially justified in bringing the action. That might be the case here. You might be able to show that. That's not what you've argued up until now. But it still strikes me as peculiar that we don't have any reason given for this dismissal. So the Comptroller did give a reason. And the reason is the passage of time because the disputed factual issues predominantly relate to petitioner's state of mind. And because at this point 11 years have passed since the underlying conduct, there are some cases that suggest that when that much time has elapsed and the remaining questions have to do with what people remembered at the time, then that does create some issues. The Comptroller was concerned about what was really in Akihoshi's mind when she sent the emails at issue. Was she confused? Were they vague? Was she lying? Twelve years is a long time. Right. Exactly, Your Honor. That is exactly what the Comptroller is concerned about. Mr. Friendly, I'd like to direct your attention to the EAJA issue. As I understand it, the OCC has made a determination that there should be no fees paid under the EAJA because there was substantial justification, but has stayed that ruling. Is that correct? That's not exactly correct, Your Honor. So the EJA application follows the same administrative procedures as our normal enforcement actions. So it is heard by the ALJ first, and then the Comptroller is the final agency decision-maker. The ALJ has entered a preliminary order denying the EAJA application on the basis of the substantial justification question without reaching the prevailing party question. That's holding up a determination of the agency, which if not to Akihoshi's liking, she can petition for appeal here in this court. So the Comptroller stayed that. It is currently before the Comptroller with review. The Comptroller has not made a final determination with respect to EAJA because, again, the Comptroller is the final agency decision-maker. Why doesn't the Comptroller make up his mind or her mind? Because the EAJA application is not timely until the case results in a final judgment. Why is the EAJA application not timely? Because under the Equal Access to Justice Act, it has to result in a final judgment, including any pending appeals, and because Petitioner has— Petitioner is holding up a final judgment on this issue other than the OCC making up its mind. Your Honor, Petitioner is holding up the final judgment by bringing this appeal because that makes the EAJA application not timely because it has not resulted in a final judgment. You mean the agency can't make up its mind about the substantial justification until this appeal is finished? That is true, Your Honor. Under the Equal Access to Justice Act, the agency—or the Petitioner, really, the applicant must wait until there's a final judgment, including the outcome of any resulting appeal, which includes this appeal right here in the underlying action. No, no, no. The agency makes up its mind independently of any appeal regarding reputational damages, et cetera, as to whether the appellant here is a prevailing party for purposes of EAJA. What I don't understand is why that hasn't been determined and her EAJA phase paid. Your Honor, I think I would just go back to the statute. EJA says that an application should be brought within 30 days after the case is over, essentially, but the case is not over because they have appealed to this court, and so it has to reach a resolution in this court first. Oh, so her appeal makes the case still alive, and therefore it's not final. Exactly, Your Honor. And I'd like to—Judge Kristen, I'd like to highlight an exchange that you had with my friend on the other side. And the argument is that there's a difference between dismissal or the comptroller's dismissal and a declaration that an action is void ab initio. But I think your questioning pointed out that there's actually no substantive difference from the perspective of Article III. A declaration that an action is void ab initio is essentially tacking on the declaratory judgment to a dismissal. So it's a dismissal plus a reason. And maybe the best way to view this is through the lens of mootness because mootness and standing are asking an identical question under Article III. Is there a live case or controversy? The only difference, of course, is that mootness is asked when there's an intervening event after the case has already been in federal court. So if we imagine that she were in district court seeking to enjoin the administrative proceedings, and if she had been raising the same structural constitutional questions, if while those proceedings were going on, the comptroller issued his final decision dismissing the action, that would moot the district court case, even though what she would be seeking in the district court was a declaration that the agency's proceedings were void ab initio. And she wouldn't be able to continue in that district court case simply because she didn't get a dismissal for the reasons that she requested. And you had an exchange about Axon, and I want to bring up that's exactly what happened in Axon. After the Supreme Court issued its decision in Axon, it was remanded to the district court so that Axon could raise its structural constitutional challenges to the agency. And the FTC dismissed the case administratively against Axon. And then both parties agreed that the district court case was then moot. Axon voluntarily dismissed its claims because they weren't simply seeking an advisory opinion on these constitutional questions. They wanted substantive relief from the administrative proceeding. Why did they have an injury on appeal? Why did they have standing? Axon? Well, so in Axon, there were still ongoing administrative proceedings.  And in this case, of course, Judge Bennett, you were quoting the language of Axon, which suggests that once a proceeding is over, it cannot be undone. So opposing counsel argued that we shouldn't view that as a limitation in Axon, that they made an exception or expanded, right, to allow the interlocutory proceeding, but we shouldn't read Axon as requiring an ongoing proceeding to establish an injury. Right. And I think I don't think Axon stands for that proposition, and I think that just runs into the redressability prong of Article III. I think there's nothing left to redress. All this court could do with respects to any of the structural issues that she claims are on appeal is issue an advisory opinion. And if you look at the issues — Her argument, to play devil's advocate, her argument is there is something that she would, he said, value very much, an order indicating that the proceeding was improper from the get-go because she finds the statements in the order of dismissal to be disparaging and professionally damaging. That is her position. Right. And that doesn't work, Your Honor, because that simply is an advisory opinion because it would be a declaratory judgment not tied to any substantive relief. Unlike in Axon, it wouldn't be tied to an injunction to stop the proceedings. It wouldn't be tied to a dismissal. So that's simply an advisory opinion. And there are some cases, I believe, that talk about some of the things that Ms. Akihoshi is seeking redress for is psychic harm, which is not redressable. Right. So I would like to briefly address this theory of reputational harm. Appellant has not cited a single case in which a court has accepted this theory of reputational injury. And, Judge Kristen, I believe I think you mentioned the potential availability of a tort claim. I think because appellate courts review judgments and not statements and opinions, there would need to be a separate collateral action and an applicable waiver of sovereign immunity to challenge something like that. But that's exactly why Congress created EJIA. And so, again, in EJIA, Ms. Akihoshi, if she prevails, in her EJIA claim would not only be entitled to monetary remedies but also a statement either from the comptroller or from a reviewing court that the OCC was not substantially justified. So that can provide this sort of psychic relief that a litigant is looking for. If she can show that the proceeding was not substantially justified. Exactly. That's what I was getting at, yes. Exactly, if she can show that the proceeding was not substantially justified. And I just want to highlight a few cases that we, although Petitioner has not pointed to a single case in which a court has upheld this theory of standing to appeal an agency order that is fully favorable, we cite several cases where the court has rejected that theory of reputational injury. So Advanced Management Technology versus the FAA in the D.C. Circuit. There, AMTI was bidding in contract with the FAA. They won a fully lucrative contract, so the FAA entered an order granting them the contract. But in that order, the FAA said that AMTI had engaged in misrepresentations in an earlier bidding process. So there was an affirmative statement from the FAA saying effectively that AMTI lied to the government. And AMTI tried to appeal that order, saying this harms our reputation. Here's a statement from the FAA saying that we lied to the government. But the D.C. Circuit rejected that, and they said that we have no allegations, much less evidence as to the present or future consequences of this language. And because appellate courts are reviewing judgments and not statements and opinions, we're not going to essentially line edit the agency order to strike out the offending language. In Robertson versus Colvin, you know, I won't go through all of the cases, but there are several cases in which courts have rejected this precise theory. And then the final thing I'd like to note is that I think this court can just look at the issues that petitioner claims are on appeal and look at the remedy provided in every single case that she cites. So a remedy for a statute of limitations, for instance, is a dismissal of the time-barred claims. Even if this court were to accept all of her theories regarding statute of limitations, that wouldn't even apply to all of the claims that Enforcement Counsel has brought here. And so the remedy would be for this court to dismiss the time-barred claims but preserve the others. But that's certainly an odd remedy in this case because the comptroller has already dismissed all of the charges. And then actually the final thing I'd like to note is in some of these other cases, there are more affirmative statements adverse to litigants than anything that appeals in the comp- anything that appears in the comptroller's final decision. Judge Bennett, you pointed out some language in the final decision. He's very clear that the posture of the case is on summary disposition. And so there were still material factual disputes. But in certain cases, including in Good Samaritan, the lower court order there had an affirmative finding that the taxpayers engaged in deceptive or manipulative conduct under Alaska law, but this court simply applied the longstanding rule of appellate practice to deny that appeal. Same with AMTI. In Robertson v. Colvin, there's a statement that Sua Sponte diagnosed the litigant with a mental illness. All of these statements are more injurious than the language that appears in the comptroller's final decision, but the courts there still did not permit them to appeal those fully favorable orders. Unless this court has any further questions, I will see- It does not appear that we do. Okay. Thank you, Your Honors. Thank you for your argument, Counsel. Counsel, could you go straight to the point that I've been trying to? It's taken a while to surface this, but opposing counsel's response is that they haven't taken the position that your client was prevailing in one proceeding and not prevailing in the other proceeding, but rather taken the position pursuant to the Equal Access to Justice Act that they were substantially justified in bringing the action. What about that? That's inaccurate, Your Honor. OCC Enforcement Counsel appealed from the ALJ's recommended decision on fees, on the fee application, and said that the ALJ should have denied the fee application not only on the grounds that the conduct was substantially justified, as demonstrated by the acting comptroller's final order, but also on the grounds that Ms. Akahoshi was not a prevailing party. So they're making that argument. The idea that, you know, my learned opposition counsel here is somehow not accountable and need not be consistent with arguments that are made by enforcement counsel, I think is along the same lines as what they're positing with respect to justiciability, which is a review and accountability-free zone, an appeal-free zone. I'm not sure it's an appeal-free zone. So my position was, going back to Judge Bennett's, I think, his very first question, there are certainly criminal defendants who wind up being vindicated, at least on the record, and feel like their lives have been really put through the wringer. You know, sometimes they lose their homes, their jobs there. It's horrendous. Absolutely. It's very, very difficult. So your client is taking a great umbrage at the text of this order, and I understand that. But if she can prove that the government was not substantially justified, it seems to me she'd be in a position to say that the administrative charges were dismissed and that they wind up paying her fees. I mean, it would be easy enough for them to have just conceded along with the acting comptroller to have issued a decision that said, based on the passage of time, I'm ordering this case to be dismissed. The acting comptroller chose not to do that. He added 20 additional pages. Counsel in front of this court says that those 20 pages said nothing and are irrelevant. Those are inconsistent positions by the comptroller. Well, let me do it this way because you are over time. He has quite a number of other cases where he's just argued them, and they're in his briefing, about analogous circumstances. Do you want to point us to authority that cuts your way? Yes, Your Honor. So there's the case that I already mentioned, which had to do with the district court issuing an opinion without jurisdiction that this court vacated. And then there's another one, and I apologize in going through and preparing for argument. I realize that I attributed this to the Shell Oil case, but really Shell Oil was talking about an earlier case in the D.C. Circuit and describing the facts of an earlier case in the D.C. Circuit. But in Shell Oil describing that earlier case, the D.C. Circuit said that they have permitted an appeal by a union whose primary argument was that the ICC lacked jurisdiction to review an arbitral award. And on the merits of the arbitral award in that case, the ICC had found in favor of the union. So the union won, but their main argument was, we should never be here in front of the ICC. And the D.C. Circuit said, that's correct. There is jurisdiction to review this fundamental question of the authority of the ICC, even though the union won on the particular award. And this case is no different from that, because the Supreme Court has said that, essentially, it's necessary to incentivize people to police the appointments clause. Ms. Akoshi has been seeking to do so from filing her initial answer in the case years and years ago. And the OCC is trying to escape review, after putting her through this gauntlet, of the structural defects in its system. And it's different from Axon, because I'm confident that if we had brought a district court case to enjoin the action, they would have said that Section 1818 doesn't permit a district court, doesn't permit review. It's different from the SEC statutes, which permit either district court actions or agency actions. And they would have said it's unreviewable. So everything that they do is unreviewable. Significantly over time. I'm going to ask you to wrap up. Is there anything else? That's it, Your Honor. I was just trying to answer your questions, though. I appreciate that, but I think I've taken you way over. So I'm going to leave it at that. Thank you both for your arguments. We'll stand in recess. Thank you, Your Honor. All right.
judges: BEA, CHRISTEN, BENNETT